**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-01336-CMA-CBS

TAYLOR ANDERSON, LLP, a Colorado limited liability partnership,

    Plaintiff,

v.

U.S. BANK NATIONAL ASSOCIATION, a National Bank corporation, and
ADRIAN D. STONE, an individual,

    Defendants.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendants' Motion to Dismiss (Doc. # 15), which this Court converts into a Motion for Summary Judgment and considers together with Defendants' recently-filed Motion for Summary Judgment (Doc. # 49). These motions are addressed together because, as relevant here, both raise similar arguments, and the parties have supplied full briefing for both motions. *See Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709, 713-14 (10th Cir. 2005).

For the following reasons, this Court grants summary judgment to Defendants on all claims.

**I.    BACKGROUND**

The claims asserted by Plaintiff Taylor Anderson resulted from an international e-mail scam targeting United States law firms and involving fraudulent cashier's checks.

1

Taylor Anderson fell victim to the scam.  Ultimately, a third party defrauded Taylor Anderson of $191,000 from Taylor Anderson's bank account at Defendant U.S. Bank National Association ("U.S. Bank").  In this case, Taylor Anderson seeks to recover this amount from Defendants—U.S. Bank and Ms. Adrian Stone, an employee of U.S. Bank—essentially alleging that Defendants are to blame for its having fallen prey to this fraudulent scheme.

Taylor Anderson's theory as to why Defendants are liable is based on a series of oral and email communications that occurred between Taylor Anderson and Defendants.  These communications, however, must be interpreted in conjunction with the deposit agreement ("the Agreement") that governs Taylor Anderson's deposits at U.S. Bank.

### A. THE DEPOSIT AGREEMENT

For purposes of this case, the Agreement includes four provisions that address the status of a deposit once a check has "cleared" and the funds appear in the depositor's account.  First, under the heading of "Liability for Charges and Overdrafts," the Agreement states that "[a]n **overdraft** occurs if you take more money out of your account than is available to you for withdrawal, or if it is available to you **but is later reversed**.  This can happen . . . by making a deposit, withdrawing money based on that deposit, and having that **deposit reversed because the deposited item is later returned to us unpaid**." (Doc. 49-20, at 4 (first emphasis in original; second emphasis added).)  Thus, the Agreement clearly informs U.S. Bank customers that one form of

overdraft occurs if an item is deposited but U.S. Bank is later unable to obtain the funds linked to the deposited item and the deposited item is returned unpaid.

Second, under the heading "Deposits," the Agreement states:

> When you make a **non-cash deposit to your account, we give you credit for that deposit, but that credit is provisional (temporary)**. If the deposit needs to be collected from another financial institution, we must be paid before the credit becomes final. After a credit is final it may still be reversed. See the sections titled Returned Deposited and Cashed Items and Funds Availability.

(*Id.*, emphasis added.) By virtue of this provision, U.S. Bank placed Taylor Anderson on notice that merely because a deposit is "credited" to its account, does not mean that the process of definitively obtaining those funds has concluded; rather, if the deposit needs to be collected from another institution [as was that case here], the other institution must pay U.S. Bank before the credit to Taylor Anderson's account becomes final. Moreover, this provision provides notice to Taylor Anderson that, even if the credit becomes final, it could still be reversed.

Third, immediately following the section entitled "Deposits," there is a section entitled "Returned Deposited and Cashed Items." This section explains how funds that are collected are deposited into an account and how some deposits are reversed if there is a problem in the collection process. In pertinent part, this provision states:

> The funds you deposit to your account are subject to normal collection processes **even after we make the funds available to you for withdrawal (*i.e.*, the check has "cleared").** If we do not collect the funds, or we need to return the funds, your deposit will be reversed and become your responsibility.

(*Id*. at 6, emphasis added.)  This section places Taylor Anderson on notice that, even after a deposited check has "cleared," the deposit may still be reversed, in which case the depositor, not the bank, bears responsibility for the bank's inability to collect.

Fourth, near the end of the Agreement, a bold heading written in the largest font size used in the Agreement states in pertinent part:

**FUNDS AVAILABILITY: YOUR ABILITY TO WITHDRAW FUNDS—ALL ACCOUNTS**

\*\*\*

> Please remember that **even after the item has "cleared," we have made funds available to you and you have withdrawn funds, you are still responsible for items you deposit** that are returned to us unpaid and for any other problems involving your deposit. See our Returned Deposited and Cashed Items section.

(I*d*. at 13; emphasis added.)  This provision cross-references the third provision mentioned above and again explicitly states a second time that just because a deposit has "cleared," it does not follow that the funds are definitively in the account or that the crediting of those funds is not subject to reversal.

### B.  FALL 2012 TRANSACTION

The events giving rise to this litigation resulted from Taylor Anderson's representation of Mr. Alex Carney, who purportedly lived in Japan and retained Taylor Anderson to help him collect a $378,000 settlement purportedly owed him by North American Iron & Steel ('NAI&S").  In partial payment of the settlement, NAI&S submitted a $191,000 cashier's check purportedly issued by Chase Bank.  (Doc. # 4 at 2.)  In late

September 2012,[1] Taylor Anderson deposited the $191,000 cashier's check into its client trust account, which it maintained with U.S. Bank.

In a series of email exchanges on October 1, 2012, Taylor Anderson informed U.S. Bank that it planned to wire $189,000 of the check's proceeds to Mr. Carney in Japan but wanted to know more about the funds associated with the check. (Doc. # 49-17.) At about 10:00 a.m. on October 1, 2012, Defendant Ms. Stone began an inquiry as to whether the check "ha[d] cleared" from Chase bank, the bank upon which the check was drawn. (*Id.* at 2.) About an hour later, Ms. Stone followed up in a second email to Taylor Anderson stating "[i]t was drawn on Chase, and has cleared." (Doc. # 49-19 at 2.) Subsequent to receiving this email from Ms. Stone, Taylor Anderson wired $189,000 to an account used by Mr. Carney, and kept the remaining $2,000 as payment for legal services rendered. (Doc. # 49-2 at 10.)

Several days after Taylor Anderson wired this money, Chase Bank determined that the check was fraudulent and dishonored the check. U.S. Bank in turn informed Taylor Anderson about the fraud and its liability for the amount of the check. (Doc. # 4 at 3.)

On April 18, 2013, Taylor Anderson sued Ms. Stone and U.S. Bank, advancing four claims related to Ms. Stone's representations concerning the check's status and Defendants' contractual obligations to Taylor Anderson. In particular, Taylor Anderson alleges that Ms. Stone's representations constituted a breach of contract, negligent misrepresentation, fraud, and negligence. (Doc. # 4.) Defendants in turn have filed

---

[1] The Parties do not indicate exactly when.

motions to dismiss and for summary judgment that, as noted above, are considered together by this Court.

## II. ANALYSIS

### A. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In analyzing the evidence on a motion for summary judgment, this Court must view the factual record and draw reasonable inferences in favor of the non-moving party. *Kidd v. Taos Ski Valley, Inc.,* 88 F.3d 848, 851 (10th Cir. 1996).

"There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Further, "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.*

The Court applies the following standard to each of Taylor Anderson's four claims and explains why none of the claims survive Defendants' summary judgment motion.

### B. APPLICATION

#### 1. Breach of Contract Claim

First, this Court addresses Taylor Anderson's breach of contract claim. "Under Colorado law, contracts 'should be interpreted consistently with the well-established

principles of contractual interpretation.'" *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (quoting *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002)).

In accord with those principles, "courts must 'examin[e] the entire instrument, and not . . . view[ ] clauses or phrases in isolation.'" *Id.* (quoting *Allstate*, 52 P.3d at 819) (alterations and ellipses supplied by *Level 3* court). Further, "[a]s an overarching principle, in construing a contract, courts must also 'consider the subject matter, the object of making it, the sense in which the parties naturally understood it at the time it was made, and the purposes and objects to be accomplished thereby.'" *Id.* (quoting *Total Petroleum, Inc. v. Farrar,* 787 P.2d 164, 167 (Colo. 1990)). Finally, "[w]hen a contractual provision unambiguously resolves the parties' dispute, the interpreting court's task is over." *Id.* In other words, "[i]t is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence." *Id.* (quoting *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310, 1314 (Colo. 1984)).

There is no genuine dispute of material fact regarding whether U.S. Bank honored its contractual obligations to Taylor Anderson. As an initial matter, based on this Court's review of the "entire instrument" in question here, *cf. Allstate*, 52 P.3d at 819, the Agreement is unequivocal on what the term "cleared" means: in two separate portions of the agreement, when the term "cleared" is used, the Agreement explains that this means the amount of the check is conditionally credited to the account, although this determination is subject to reversal. This meaning of "cleared" is reinforced by other admonishments in the Agreement concerning the "provisional" nature of non-cash

deposits and warnings about how an item deposited and credited to an account can later be reversed if the deposit is returned to U.S. Bank unpaid.

Further, this Agreement is a bargained-for exchange between two sophisticated actors—one of which is trained in the law—and it tracks the default rule from the Uniform Commercial Code (UCC), which places risk during the collection process on the depositor and not on the collecting bank.  *See* C.R.S. § 4-4-201(a); *Mercantile Bank & Trust Co. v. Hunter*, 501 P.2d 486, 487 (Colo. App. 1972) ("The risk of loss on the check remained in [depositor], as its owner, and not upon the agent [b]ank").

Finally, there is no dispute that representatives of U.S. Bank, in responses to inquiries from Taylor Anderson, consistently stated that the check "had cleared."  This Court sees no representation from U.S. Bank establishing that the check had both cleared and that the credit in the account was not subject to reversal.  Rather, all the representations in the record demonstrate that U.S. Bank stated only that the check had "cleared."

Based on this evidence, this case falls within the heartland of cases in which a bank says the check "has cleared," the client misinterprets this representation to mean that the credited deposit is not subject to reversal, and then a subsequent reversal triggers what are ultimately determined to be non-meritorious claims against the bank. These claims consistently fail because they rely on the client's misinterpretation of a contract similar to the instant one or because the default rule from the UCC applies.[2]

---

[2]  Defendants cite as demonstrative of this line of reasoning the following cases: *Call v. Ellenville Nat'l Bank*, 5 A.D.3d 521, 522 (N.Y. App. Div. 2004); *Banknorth N.A. v. Zeeman*,

Taylor Anderson resists this conclusion and advances a number of arguments in an attempt to distinguish this case and place it outside of this heartland. For the reasons stated below, this Court finds none of the arguments persuasive.

First, Taylor Anderson complains about the length of the Agreement and the fact that the term "cleared" is never "explicitly defined" in the same. (Doc. # 51 at 15.) This Court finds the length-based argument an almost non-starter, especially because Taylor Anderson is a law firm with expertise in complex commercial transactions and cites no authority for the proposition that because a contract is long, it is axiomatically non-binding. Further, the plain language of the contract supplies a definition of the term "cleared," and Taylor Anderson cites no authority holding that a party is bound by a term only if it is "explicitly defined" in a definitions section of a contract.

Second, Taylor Anderson cites extrinsic evidence suggesting that the term "cleared" in other contexts means that the funds are credited to the account and the decision to credit the amount is no longer subject to reversal. (*Id.*) But this reliance on extrinsic evidence is unavailing in light of what this Court sees as the plain meaning of the term as defined in the Agreement. *Cf. Pepcol Mfg.,* 687 P.2d at 1314.

Third, Taylor Anderson emphasizes that its interpretation of the term "cleared" was different from the one stated in the contract and that this interpretation should somehow be given controlling weight. Taylor Anderson's different interpretation seems to stem in large part from the fact that no firm representative responsible for the Fall 2012 transaction actually read the Agreement before this incident. (Doc. # 49, ¶ 39;

---

No. 173-3-04-Wncv, 2004 Vt. Super LEXIS 69, at *10-12 (Sup. Ct. Vt. Dec. 20, 2004); *Moughrabie v. Citibank*, N.A., 867 N.Y.S.2d 376, 376 (N.Y. App. Div. 2008).

Doc. # 51, ¶ 39.) This Court does not doubt that Taylor Anderson had this differing interpretation, perhaps based on its failure to read the Agreement, but that does not exempt Taylor Anderson from the force of this contract provision: here, it is not a party's subjective intent that counts for purposes of interpreting a contract, but rather what the unambiguous terms state.

Fourth, Taylor Anderson attempts to paint Ms. Stone as a nefarious character who must have acted fraudulently or negligently when she stated that the check "cleared." For example, Taylor Anderson argues that Ms. Stone "knew [Taylor Anderson] asked whether 'the funds are good,' knew that meant whether the [c]heck was good and valid, knew the specific [c]heck [Taylor Anderson] was referring to, knew [Taylor Anderson] did not mind waiting to ensure the funds were good, and knew Taylor Anderson intended to wire funds from that [c]heck to a foreign country." (Doc. # 51 at 13.)

This argument fails for a number of reasons. As an initial matter, it relies on conclusory allegations about what Ms. Stone allegedly knew—allegations which are vigorously contested by Ms. Stone and ones that find no support in the record. Taylor Anderson does not get beyond summary judgment on such a weak and speculative theory, especially one devoid of record support. *Cf. Bones*, 366 F.3d at 875 ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."). Further, contrary to Taylor Anderson's contentions, U.S. Bank did not provide false information to Taylor Anderson—it merely

10

provided information that was accurate and faithful to the Agreement, but which Taylor Anderson did not fully appreciate.[3]

Finally, Taylor Anderson seems to allege that because Ms. Stone knew that the money in question was being wired to a foreign country for a newer client, it should have been on alert to Taylor Anderson's (apparent) concerns about fraud. But Taylor Anderson provides no basis for making the connection between foreignness or newness and presumptive fraud, and it advances no convincing explanation about why, if it really was worried about fraud in this case, it did not explicitly convey this concern to U.S. Bank. In any case, this Court will not place a burden on Ms. Stone to read between the lines on these communications from Taylor Anderson, much less bind her in some way to Taylor Anderson's *post hoc* interpretation of the message it was attempting to convey.

In sum, on this Court's interpretation of the plain meaning of the Agreement, U.S. Bank was required to credit deposits in Taylor Anderson's bank account but was allowed to reverse its initial determination as to credits if, for example, a deposit was returned as unpaid. This same provisional-credit condition applied when a check had

---

[3] A variation of this argument fails for similar reasons. In particular, Taylor Anderson alleges that over the course of the professional relationship between the parties, Defendants had been asked to confirm that credits for Taylor Anderson deposits were no longer subject to reversal. Plaintiff argues that if this relationship is taken into account, when Ms. Stone said that the check had cleared, she conveyed a meaning different from the one in the Agreement. (Doc. # 51 at 12-13.) But regardless of what Defendants had been asked to do in the past, in this instance, they only represented that the check had "cleared." If Defendants had represented that the check had cleared and that the credit was no longer subject to reversal—a fact pattern Taylor Anderson desperately wants to impose on this case—it would be a different story. But those are not the facts presented here—and this Court will not resort to relying on instances in which Defendants supplied very different information to Taylor Anderson when assessing the specific communications giving rise to this litigation.

"cleared." These contract provisions govern this case and responsibility for the reversed deposit lies with Taylor Anderson.

### 2. Other Claims

Next, Taylor Anderson advances negligence, negligent misrepresentation, and fraud claims against Defendants. All three of these claims are predicated on Taylor Anderson's allegation that the Defendants' "voluntarily investigated the origins and validity of the [c]heck" in question and either fraudulently or negligently reported what they had determined to Defendants. (Doc. # 4 at 2.)

These claims are all barred by the Economic Loss Rule. As the Tenth Circuit concisely set forth in a recent case, under Colorado law, this rule establishes as follows:

> "Broadly speaking, the economic loss rule is intended to maintain the boundary between contract law and tort law." *Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1259 (Colo. 2000); *see generally id.* at 1259–64 (describing in detail the rule's origins). Accordingly, under Colorado law, the "proper focus in an analysis under the economic loss rule is on the source of the duties alleged to have been breached." *Grynberg v. Agri Tech, Inc.,* 10 P.3d 1267, 1269 (Colo. 2000). Boiled down, the rule prohibits "a party suffering only economic loss from the breach of an express or implied contractual duty [to] assert a tort claim for such a breach *absent an independent duty of care under tort law.*" *Id.* (emphasis added). An independent duty of care under tort law thus serves as the boundary between contract and tort law, permitting only those tort claims that allege such a duty has been breached. *See A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.,* 114 P.3d 862, 865–66 (Colo. 2005).

*Level 3*, 535 F.3d at 1162.

The Economic Loss Rule applies here because Taylor Anderson cannot point to an independent duty in tort law that arises outside of the duties created by the Agreement. As to this question, what is most devastating to Taylor Anderson is its

**own interpretation** of the "explicit and implicit" duties arising out of the Agreement which, as described in its complaint, include the following:

> the duty and obligation to provide complete and accurate answers to questions from Plaintiff concerning its client trust account, the duty and obligation to take appropriate and reasonable actions to protect and safeguard the funds in the account, and the duty and obligation to act in good faith and to deal fairly with Plaintiff in the exercise of its rights and responsibilities under the Agreement.

(Doc. # 4, ¶ 17.)

Taylor Anderson attempts to argue around the force of the Economic Loss Rule by suggesting that Defendants incurred allegedly "independent duties" by allegedly agreeing to investigate the validity of the check. But that is just another way of saying that the Defendants were performing their contractual duty "to take appropriate and reasonable actions to protect and safeguard the funds in the account." Further, for the reasons stated above, Defendants fulfilled their investigative duties in informing Taylor Anderson that, based on their investigation, the check had "cleared"—an accurate representation of what had in fact occurred based on how that term is used in the Agreement.

### III. CONCLUSION

For the foregoing reasons, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. # 49) is GRANTED and the Motion to Dismiss (Doc. # 15) is GRANTED as a converted motion for summary judgment. Accordingly, this case is DISMISSED WITH PREJUDICE, and the Clerk of the Court shall enter judgment in favor of Defendants and against Plaintiff. Pursuant to D.C.Colo.LCivR 54.1, Defendants

may thereafter have their costs by filing a bill of costs within 14 days of the date of that judgment.

DATED:  March   31  , 2014

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

14